Amanda Williams ("Williams") approached Cindy Berry, a real-estate agent with Travis Realty, Inc., seeking assistance in buying her first house. Berry told Williams and her husband, Bert Williams,[1] that as a low-income family they qualified for a program sponsored by AmeriDream, Inc.[2] That program provides financial assistance to low-income families to help them with the down payment on a house. Williams eventually made an offer on a house owned by Mary France Shadrix, who had listed the house with Berry. Because Berry had a relationship with Shadrix, Berry and Williams signed a limited consensual dual-agency agreement, which meant that Berry would be working as an agent for both Williams and Shadrix. Nonetheless, Berry had an obligation to explain the necessary procedures for purchasing a house to Williams and to answer Williams's questions truthfully.
Williams applied for a mortgage from Wells Fargo Home Mortgage, Inc. Wells Fargo was required to appraise the property to determine its market value in order to secure mortgage insurance from the United States Department of Housing and Urban Development ("HUD"). Wells Fargo hired Zanaty Realty, Inc., to appraise the property that Williams was attempting to buy.
One of Zanaty's employees, Mark Stalker, performed the appraisal. Stalker has *Page 1165 
been employed by Zanaty for 14 years; he has been a home appraiser for 12 of those 14 years. Stalker is not a licensed home inspector, nor is he qualified to be a home inspector. Stalker appraised Williams's property following the procedures required under the HUD mortgage-insurance program. Stalker used a standard HUD form to conduct his appraisal. The appraisal form shows Williams as the "Borrower or Owner." It also identifies Wells Fargo as the "Lender or Client."
The appraisal contains the following disclosure:
 "I am not a licensed building contractor or professional building inspector. I am not qualified to survey or analyze physical items that are not readily visible. If any parties in this transaction have any questions or concerns regarding any mechanical or structural physical problems, condition, infestation, contamination, or other issues regarding the subject property, an expert in that field of specialty should be consulted."
Moreover, with respect to the intended use of the appraisal, the appraisal contains the following disclaimer:
 "PURPOSE, INTENDED USE, AND INTENDED USER OF THE APPRAISAL:
 "The purpose of the appraisal is to estimate the market value of the subject property, as defined in this report, on behalf of the above referenced client [Wells Fargo] as the intended user of this report. The intended use of the appraisal is to assist the client, as intended user of this report, in evaluating the subject property for lending purposes. The use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use, is prohibited."
(Capitalization in original.) Stalker testified that an appraisal conducted pursuant to HUD procedures and recorded on the standard HUD form was not a substitute for an inspection by a qualified home inspector. HUD provides a handbook for appraisers employed by lenders to determine the market value of a property for mortgage-insurance purposes. The handbook states:
 "Appraisals performed for HUD/FHA are not intended to protect the buyer: they protect HUD. Many homebuyers mistakenly believe that a HUD appraisal and subsequent inspection is a guarantee that the property is free from defects when, in fact, the appraisal only establishes the value of the property for mortgage insurance purposes."
The appraisal results on the standard HUD form are not given to buyers. Buyers are provided with a HUD form that contains a summary of the appraisal and states the following:
 "Important NOTICE TO THE HOMEBUYER Read Carefully
 "As part of our job insuring the mortgage for the lender, the FHA requires the lender to conduct an appraisal to:
 "• estimate the value of your potential new home
 "• make sure it meets minimal FHA standards
 "• ensure that it is marketable
 "Appraisals are different from home inspections.
 "Home inspections give more detailed information about your potential new home."
(Capitalization and emphasis in original.)
Williams testified that before closing on the house she purchased, she received a form from HUD entitled, "For Your Protection Get a Home Inspection." This form stated: *Page 1166 
 "As part of our job insuring the loan, we require that the lender conduct an FHA appraisal. An appraisal is different from a home inspection. Appraisals are for lenders; home inspections are for buyers."
Williams telephoned Berry when she received the form from HUD and asked Berry whether she needed to get a home inspection. Berry incorrectly informed Williams that a home inspection would be provided as part of the AmeriDream program. Williams did not conduct a preclosing inspection of the house; AmeriDream did not conduct or provide for a home inspection.
Williams never read or saw a copy of Stalker's appraisal or the appraisal summary. At the closing, Williams did not read any of the documents, but she signed the documents in the places Berry instructed her to sign.
Immediately after Williams and her husband moved into the house, they noticed a plumbing leak. Upon investigating the leak, they discovered other defects and problems with the house. The Williamses did not notice the problems with the house before they purchased it. Three months after moving into the house, the Williamses went into the attic, where they discovered damage caused by a fire that had occurred before they purchased the home.
Williams sued Travis Realty, Berry, Shadrix, Wells Fargo, and Zanaty. Wells Fargo was dismissed from the case before trial. Williams's complaint alleges that Shadrix concealed defects in the house; that Travis Realty had improperly acted as both Shadrix's and Williams's agent under a limited consensual dual-agency agreement; that Berry, as an employee of Travis Realty, committed wrongful acts of fraud, fraudulent concealment, and negligence in connection with the sale of the house; and that Zanaty negligently appraised the property. During the trial, Travis Realty and Berry settled with Williams and the trial court dismissed them with prejudice. Shadrix did not appear, so the trial court entered a default judgment for Williams against Shadrix.
Williams's claim of negligence against Zanaty was tried before a jury. The jury returned a verdict in favor of Williams. The trial court entered a judgment against Zanaty in the amount of $104,400. Zanaty renewed its motion for a judgment as a matter of law made at the close of Williams's evidence and moved for a new trial. The trial court denied both motions. Zanaty appeals.
 Standard of Review
The standard of review applicable to a ruling on a motion for a judgment as a matter of law is identical to the standard used by the trial court in granting or denying the motion. Floyd v.Broughton, 664 So.2d 897, 898 (Ala. 1995); see King Motor Co.v. Wilson, 612 So.2d 1153 (Ala. 1993); Ogle v. Long,551 So.2d 914 (Ala. 1989). A motion for a judgment as a matter of law tests the sufficiency of the evidence presented by the parties. Carterv. Henderson, 598 So.2d 1350, 1353 (Ala. 1992). Thus, we review the trial court's ruling viewing the evidence in the light most favorable to the nonmovant and determine whether the party with the burden of proof produced sufficient evidence to create a conflict warranting a determination by a jury. Macon CountyComm'n v. Sanders, 555 So.2d 1054, 1056 (Ala. 1990); John R.Cowley Bros. v. Brown, 569 So.2d 375 (Ala. 1990).
A motion for a new trial tests the weight and preponderance of the evidence. King Motor Co., 612 So.2d at 1157. A jury verdict is entitled to a presumption of correctness, and this Court will not reverse *Page 1167 
the denial of a motion for a new trial unless the evidence, seen in the light most favorable to the nonmovant, shows that the jury verdict was plainly and palpably wrong. Christiansen v. Hall,567 So.2d 1338, 1341 (Ala. 1990).
 Discussion
Zanaty argues that it was entitled to a judgment as a matter of law on Williams's negligence claim because, it argues, Zanaty, as the appraiser employed by a mortgage company, Wells Fargo, for mortgage-insurance purposes, owed no duty to Williams, the buyer. We agree.
"It is axiomatic that to maintain a negligence claim, one must point to the existence of a duty on the part of the defendant."Smith v. AmSouth Bank, Inc., 892 So.2d 905, 909 (Ala. 2004) (citing Patrick v. Union State Bank, 681 So.2d 1364, 1367 (Ala. 1996)); Morton v. Prescott, 564 So.2d 913, 915 (Ala. 1990) ("It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty."). Furthermore, "[i]t is a well-established rule of law in this state that in order to prove a claim of negligence a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff." Lowe's Home Ctrs., Inc. v. Laxson,655 So.2d 943, 945-46 (Ala. 1994).
In Fisher v. Comer Plantation, Inc., 772 So.2d 455, 462 (Ala. 2000), this Court held that "real-estate appraisers are subject to liability for negligent or wanton misrepresentation." However, the appraiser's liability for negligence is limited to those parties to whom the real-estate appraiser owes a duty — that is, "`specifically foreseen and limited groups of third parties for whose benefit and guidance the [appraiser] supplied the [appraisal] and who used it as the [appraiser] intended it to be used.'" Fisher, 772 So.2d at 462 (quoting Boykin v. ArthurAndersen Co., 639 So.2d 504, 510 (Ala. 1994)). Therefore, the Court held that "[the buyer] would have the burden of showing that . . . the appraiser, foresaw, or should have foreseen, that his appraisal would be relied upon by a limited class that included [the buyer]." 772 So.2d at 462 (citing Restatement(Second) of Torts § 552 (1977)).[3] The seller of the property in Fisher was a real-estate firm. One of the individual owners of the real-estate firm paid for an appraisal. The buyer, however, used the real-estate appraisal as the foundation for his price negotiations and, after purchasing the property, discovered that the appraisal had vastly overstated the market value of the property. On these facts, we held that the real-estate appraiser owed no duty to the buyer. We concluded that "no evidence suggests [the appraiser] knew, or should have known that [the individual owner who paid for the appraisal] was going to distribute the appraisal report to prospective purchasers." Fisher, 772 So.2d at 463.
Williams alleges that Zanaty was negligent in conducting its appraisal of her property. To support a claim of negligence, Williams must show that Zanaty owed her a duty. As this Court articulated in Fisher, the key factor in determining whether a real-estate appraiser owes a duty to a buyer of the appraised property is whether injury to the buyer was foreseeable by the appraiser. See Fisher, 772 So.2d 455; see also Taylor v.Smith, *Page 1168 892 So.2d 887, 892 (Ala. 2004); Bush v. Alabama Power Co.,457 So.2d 350, 353 (Ala. 1984) ("The ultimate test of a duty to use care is found in the foreseeability that harm may result if care is not exercised.").
Viewing the facts in the light most favorable to Williams as the nonmovant, we conclude that the facts in this case do not support Williams's contention that Zanaty owed her a duty. Williams contends that Zanaty knew or should have known that she would rely on the appraisal as an indication of the condition of the house. However, the appraisal expressly discloses that Zanaty's appraiser, Stalker, "is not a licensed building contractor or professional building inspector" and is "not qualified to survey or analyze physical items [in the house] that are not readily visible." Zanaty could not foresee that Williams would rely on Stalker's appraisal to ensure the condition of her house, because the appraisal expressly precludes the use of the appraisal for that purpose.
Moreover, because she was not the intended user of the appraisal, Williams was not even given a copy of it. Wells Fargo hired Zanaty to conduct an appraisal of Williams's house to ascertain its market value so that Wells Fargo could obtain mortgage insurance through HUD. The intended-use statement in the appraisal reads: "The purpose of the appraisal is to estimate the market value of the subject property, as defined in this report, on behalf of the referenced client as the intended user of this report." "Wells Fargo Home Mortgage" is listed as the "Lender or Client." The appraisal contains an express prohibition, stating that "[t]he use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use, is prohibited." Williams's use of the appraisal as a substitute for a home-inspection report is thus expressly precluded under the terms of the appraisal itself — Williams is not within the limited group of third parties for whose benefit and guidance Zanaty supplied the appraisal and who used it as Zanaty intended it to be used. Fisher, 772 So.2d at 462. Therefore, our holding in Fisher compels us to find that Zanaty owed Williams no duty.[4]
Even if Williams could somehow prove that her reliance on the appraisal was foreseeable, any duty Zanaty might have owed her was nullified by the disclaimer language in the appraisal:
 "The purpose of the appraisal is to estimate the market value of the subject property . . . on behalf of [Wells Fargo] as the intended user of this report. The intended use of this appraisal is to assist [Wells Fargo] . . . in evaluating the subject property for lending purposes."
The appraisal also states the following with regard to structural elements of the house:
 "I am not a licensed building contractor or professional building inspector. I am not qualified to survey or analyze physical items that are not readily visible. If any parties in this transaction have any questions or concerns regarding any mechanical or structural physical problems, condition, infestation, contamination, or other issues regarding the subject property, *Page 1169 
an expert in that field of specialty should be consulted."
In Brushwitz v. Ezell, 757 So.2d 423 (Ala. 2000), this Court found that a similar disclaimer eliminated any duty between Ezell, the appraiser, and the Brushwitzes, the buyers. The mortgage lender hired Ezell to appraise the Brushwitzes' house. The appraisal in Brushwitz contained the following disclaimer:
 "`You should note that:
 "`1) The appraisal was performed for the lender's use to determine the adequacy of the property as security for the loan and not for your use to determine value,
 "`2) the appraisal does not guarantee nor imply that the house is free of defects, and
 "`3) you need to take whatever steps you feel are necessary to assure yourself that this house is acceptable to you before closing the purchase of the home.'"
757 So.2d at 426. Under the facts in Brushwitz, Ezell should have foreseen that the Brushwitzes would rely on the appraisal; however, we held that the disclaimer altered the relationship between Ezell and the Brushwitzes and eliminated any duty Ezell owed to the Brushwitzes. Our holding in Brushwitz compels us to conclude in this case that, even if a duty running from Zanaty to Williams could somehow be inferred, the disclaimer in the appraisal terminated that duty.
 Conclusion
Reviewing the evidence in the light most favorable to Williams, we conclude that Williams did not meet her burden to produce evidence sufficient to create a conflict warranting a jury determination as to whether Zanaty owed Williams a duty. Therefore, we hold that Zanaty was entitled to a judgment as a matter of law on Williams's negligence claim. Because of that holding, we need not address Zanaty's argument that it is entitled to a new trial. We, therefore, reverse the trial court's judgment and render a judgment in favor of Zanaty.
REVERSED AND JUDGMENT RENDERED.
NABERS, C.J., and STUART and BOLIN, JJ., concur.
HARWOOD, J., concurs in the result.
[1] Amanda Williams is the only named plaintiff because only her name appears on the documents relating to the purchase of the house.
[2] AmeriDream, Inc., is a nonprofit organization under §501(c)(3) of the Internal Revenue Code, whose mission is "[t]o expand affordable housing opportunities for underserved groups and promote the value of home ownership as the foundation for building strong communities and individual prosperity."
[3] "(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."Restatement (Second) of Torts § 552 (1977).
[4] Similarly, Zanaty could not foresee that giving Williams a copy of the HUD form Zanaty was required to fill out summarizing the results of its appraisal would cause Williams to rely on the appraisal as a substitute for a home inspection. The HUD form is captioned: "Important NOTICE TO THE HOMEBUYER Read Carefully." (Capitalization in original.) The form states that "[a]ppraisalsare different from home inspections" (emphasis in original) and informs the buyer that "[h]ome inspections give more detailed information about your potential new home."